IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL EDWARD JOHNSON, #335470   *
        Plaintiff
   v.                              *    CIVIL ACTION NO. JFM-10-729

HUBERT MICKEL, M.D.,             *
DIANE WINDLE, R.N.,
APRIL SHIPLEY, L.P.N.,            *
J. MICHAEL STOUFFER, COMMISSIONER[1]
        Defendants         *
                                    ***

## MEMORANDUM

Defendants April Shipley and Diane Windle (the "medical defendants") have filed a motion to dismiss or for summary judgment,[2] which is unopposed.[3] ECF No. 14. Also pending is state defendant Stouffer's dispositive motion (ECF No. 18), and plaintiff's notice of voluntary dismissal with prejudice as to the state defendant.[4] ECF No. 20. Upon review of papers and exhibits filed, the court finds an oral hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2010).

**Background**

Plaintiff alleges that on February 1, 2010, he was assaulted by Patuxent Institution personnels during transportation to the North Branch Correctional Institution ("NBCI"). Once at NBCI, he claims that medical authorities and Division of Correction officers placed him in a cell without treatment, medication, medical supplies or care. He states that defendant Shipley ordered him

---

[1] The Clerk shall amend the docket to reflect the correct spelling and full name of defendant Stouffer.

[2] Dr. Hubert Mickel has not been properly served with the complaint. For the reasons that follow, even if Mickel had been properly served, plaintiff's claims against him would be subject to dismissal.

[3] Plaintiff was given the requisite notice and an opportunity to oppose the dispositive motion, in compliance with *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and has failed to do so.

[4] The notice of voluntary dismissal shall be granted pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii).

into a holding/isolation cell where he was held more than fourteen hours and provided only a mattress on the floor. He further states that he was given a false medical diagnosis "to cover up for CMS staff and correctional officers." ECF No. 1.

Plaintiff further alleges that defendant Dr. Hubert Mickel later discharged him from Western Correctional Institution ("WCI") without examining him for injury and made up false medical notes for "personal reasons." *Id.* Plaintiff states that Mickel improperly examined and diagnosed his neurological problems despite the fact that Mickel was not a neurologist. As a result of Mickel's actions, officers allegedly handcuffed plaintiff without cause behind his back and dragged him from the infirmary.

Plaintiff states that defendant Windle falsified medical records and instructed officers to use force upon him to force him to walk. She also refused to give plaintiff medical supplies knowing that he had damaged hands and a spinal injury. *Id*

**Alleged Use of Excessive and Unnecessary Force**

The uncontroverted evidence reveals that on February 1, 2010, while plaintiff was being transported from Patuxent Institution, he became violent and combative, destroying state property and assaulting Officer King. ECF No. 19, Ex. 1 & 2. King used his right hand to control plaintiff and prevent him from further destroying property or harming himself or others. King held plaintiff's shoulder for approximately two and half hours during transport, applying pressure on plaintiff's shoulder in order to contain him.[5]

**Plaintiff's treatment for urinary incontinence**

Shipley evaluated plaintiff upon his arrival at NBCI on February 1, 2010, at the request of security staff. She found plaintiff lying in his cell. He stated that he could not walk. He was incontinent. Plaintiff was transported by wheelchair to the medical room. Plaintiff advised

---

[5] King is not named a party to this action.

medical staff that he had been assaulted by the transport officers. He complained of back pain and pain in his right hand and advised medical staff that he performs self-catheterization to empty his bladder. The examination notes reveal that plaintiff was alert and conversing with staff, his clothing was soiled with urine and feces, his right hand was slightly swollen, he had an old scar on the back of his neck, and he was in no apparent distress. Shipley referred plaintiff to the Chronic Care Clinic for follow-up evaluation and treatment as necessary.[6] After Shipley helped him clean himself, plaintiff was returned to his cell. Shipley had no further contact with plaintiff. ECF No. 14, Ex. B.

On March 26, 2010, Nurse Adams was asked by correctional employees whether plaintiff needed a urine collection bag. Adams noted in the medical records that, according to correctional staff, plaintiff had taken his urine bag and squeezed it until it burst then threw the bag and urine under his cell door onto the tier. Adams noted that plaintiff had been provided adult diapers, straight catheters, and had access to a toilet in his cell. Adams did not reissue a urine collection bag, and opted to have the physician evaluate plaintiff before issuing any additional urine bags.[7] *Id*., Ex. C.

On April 3, 2010, plaintiff was provided three straight catheters and two condom catheters. On April 26, 2010, Dr. Arnaout evaluated plaintiff and ordered urinary catheterizations as needed as recommended by the urologist, even though plaintiff was not then suffering urinary retention. Arnaout noted that he did not see a medical reason for plaintiff to use a Texas catheter and recommended that plaintiff perform self-catheterization as needed when he felt he was retaining urine and then return the catheter, bag, and urine collected. Arnaout also

---

[6] Plaintiff has a history of spinal stenosis, bipolar disorder, and impulse control disorder, and uses adult diapers and condom catheters for incontinence/urinary retention. *Id*., Ex. C.

[7] Adams is not a party to this action.

3

found no physical reason why plaintiff needed to self-catheterize, noting that if he had a true neurogenic bladder plaintiff would not be able to feel when he was retaining urine. Arnaout opined that there may be a psychiatric explanation for plaintiff urinating on himself or the floor. Plaintiff continues to be followed by the psychiatric department, continues to receive condom catheters and straight catheters, and has been referred for outside medical consultation. *Id*., Ex. C.

**Medical Treatment for Epilepsy**

Plaintiff has a history of refusing to take prescribed seizure and psychiatric medications. *Id*. On February 3, 2010, plaintiff was transferred to the infirmary for observation due to possible seizures after not responding to officers on his tier. Dr. Ottey evaluated plaintiff, found that plaintiff was not postictal,[8] and noted that plaintiff has been refusing his antiepileptic medications. Ottey discussed with plaintiff the importance of taking his medications. On February 4, 2010, Dr. Espina noted that plaintiff's tests for epilepsy were negative and that plaintiff refused all psychiatric and seizure medications. Plaintiff was discharged back to his housing unit on or about February 10, 2010.[9] *Id*.

Defendant Windle's only contact with plaintiff during this time was on February 9, 2010, when she evaluated him for discharge back to his housing unit. Windle noted that plaintiff became very upset when he learned he would be discharged without a wheelchair, and advised Windle that he could not walk. Windle noted that plaintiff had an indwelling urinary catheter in place and that he was irritable, anxious and had poor insight. Security officers had to physically remove plaintiff from the infirmary because he refused to walk. Windle indicates she did not instruct security officers to use force against plaintiff. *Id*., Ex. A.

---

[8] A period of drowsiness that commonly follows a seizure.

[9] Neither Ottey nor Espina are named as parties herein.

On March 9, 2010, Nurse Durst responded to plaintiff's cell when he was found to be unresponsive and possibly postictal. Upon examination Durst found plaintiff to be drowsy but easily aroused, and his physical examination was normal. Durst noted that plaintiff was forcing himself to drool and spit foam. He stopped the seizure-like activity to respond to her. Durst's assessment was that plaintiff was "faking [his] signs and symptoms for attention" and advised the tier officer to notify the medical department if plaintiff appeared unconscious again. She further noted that no immediate intervention was necessary.

On March 14, 2010, plaintiff was again evaluated for possible seizure activity. Upon arriving at plaintiff's cell, Nurse Adams found plaintiff sitting on the floor with his back against the bunk and his eyes open. Adams noted that plaintiff acknowledged her arrival with eye contact and a few minutes later responded to verbal commands. Her assessment was possible pseudo-seizure behavior. *Id*.

On March 25, 2010, Nurse Bray responded to plaintiff's cell for possible seizure activity. Bray found plaintiff on his bunk, with his eyes open, but not responding to voices. Bray noted no injuries. When Bray took plaintiff's blood pressure, plaintiff sat up and began to respond to verbal commands. Plaintiff denied pain. He continues to be followed for possible seizure activity but refuses to take prescribed anti-seizure medication. *Id*.

On April 18, 2010, Windle evaluated plaintiff in the infirmary. She noted plaintiff was very upset, demanded the attention of the security officer, and had thrown his shower chair against his cell door. Later plaintiff calmed down and apologized for his outburst. He advised Windle that he was not taking his psychiatric medications.

Windle next evaluated plaintiff on April 20, 2010. She noted plaintiff was calm, cooperative and pleasant toward the staff. He was in no acute distress and his physical

5

examination was normal. Windle's assessment was that plaintiff was independent in his urinary and personal care. She observed plaintiff walking unsteadily to his cell door but he was able to stand stable and keep himself erect. She further noted that he continue to refuse his psychiatric medications. Windle deies falsifying medical records or telling officers to use force against plaintiff or handcuff him behind his back. *Id.*

**Plaintiff's Medical Treatment for Paraplegia**

While incarcerated at the Jessup Correctional Institution ("JCI"), plaintiff was admitted to the infirmary for a urinary tract infection and deep vein thrombosis. He was discharged from JCI on November 19, 2009. At that time Dr. Sisay noted that plaintiff reported numbness and an inability to use both of his legs and was incontinent of urine and feces. He was admitted to the University of Maryland Medical Center ("UMMC") on October 21, 2009 and returned from UMMC on October 25, 2009, with a diagnosis of paraplegia of unknown etiology. Dr. Sisay noted that plaintiff had been evaluated by a neurologist who found no organic neurologic cause for the paraplegia. Sisay further noted that the UMMC emergency physician reported that plaintiff's CT scan of the head, neck, chest, abdomen and pelvis were normal and that the MRI of plaintiff's cervical and thoracic spine showed nothing other than degenerative disc disease. *Id.*, Ex. C.

While in the JCI infirmary, plaintiff was provided condom catheters and adult diapers but occasionally did not use them. Sisay noted that plaintiff did not have incontinence upon waking when he did not use the condom catheter or diapers. Sisay's examination of plaintiff revealed plaintiff had good rectal sphincter tone and his paraplegia had resolved for the most part upon his discharge from the infirmary. Sisay further noted that plaintiff was able to perform his daily activities without support. On the day of his discharge from the infirmary, plaintiff assaulted a

nurse and was physically be restrained by a security officer. Sisay further noted that plaintiff was receiving physical therapy but the physical therapist reported that plaintiff did not follow instructions. *Id*.

On February 1, 2010, security reported to Nurse Adams that plaintiff was able to rise and walk from the wheelchair provided during his transfer to the facility. Plaintiff was also observed walking to the psychiatrist's office earlier that day. On February 3, 2010, Dr. Ottey noted that plaintiff informed security officers that he used a wheelchair when he was in the prison mental health unit at Jessup. At the NBCI infirmary, plaintiff was observed standing at his bedside and pushing his stationary bedside table across the room. He was given a walker to use while in the infirmary. *Id*.

Plaintiff was evaluated by Dr. Mickel on February 9, 2010. Mickel noted plaintiff had been observed walking and using his feet in a purposeful manner. Mickel tested plaintiff's plantar reflexes in both feet and found them to be normal, indicating that plaintiff had normal central nervous system control of his movements. Mickel noted atrophying of plaintiff's muscles in his lower extremities and advised plaintiff that continued use of a wheelchair would only contribute to more atrophy. When plaintiff was discharged from the infirmary he was not provided a wheelchair. Rather, Mickel ordered a physical therapy evaluation and six sessions of physical therapy. *Id*., Ex. C.

On March 14, 2010, plaintiff was evaluated in his cell for complaints of a nose bleed. Nurse Adams noted that when she arrived at plaintiff's cell he was standing at the door yelling, gesturing with both hands, and moving all extremities. Plaintiff refused to be examined and began jumping up and down, banging on the cell door and glass. Adams noted that entrance into the cell was not necessary at that time based on her visual observation of plaintiff and his

aggressive behavior. *Id.*

On March 18, 2010, plaintiff was evaluated by Physician's Assistant Schindler due to complaints of chest pain. Plaintiff advised Schindler that he could not move his right foot, "but he was able to pull himself up from his wheelchair, hop and twist in midair from the floor, over the step and onto the examination table." *Id.*, p. 17. Plaintiff complained that he was not receiving the correct medical supplies. Schindler's examination revealed that plaintiff was in no apparent distress and his exam was normal. *Id.*

On March 30, 2010, plaintiff was evaluated by Dr. Arnaout who noted that plaintiff's neurological examination was ambiguous and did not match any anatomical nerve distribution. When Arnaout repeated his examination, plaintiff's areas of weakness were different than in previous exams. While plaintiff complained of weakness in his right arm and leg, he was able to catheterize himself using his right hand. Additionally, plaintiff's reflexes were normal. Dr. Arnaout found that plaintiff was manipulating the examination. *Id.*

## Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state an Eighth Amendment claim for denial of medical care, plaintiff must demonstrate that the actions of defendants (or their failure to act) amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (no expectation that prisoners will be provided with unqualified

access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry. The second component of proof requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris* 240 F. 3d 383 (4th Cir. 2001), citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken). Further, "[d]isagreements between an inmate and a physician over the inmate's proper care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

Plaintiff has failed to demonstrate that he has been denied medical care. Medical records indicate that plaintiff suffered from a seizure disorder but refused to take his medication. The records further demonstrate that plaintiff was provided all necessary medical devices in order to address his incontinence issues. The medical records along with the affidavits of Nurse Windle, Nurse Shipley, and Dr. Arnaout refute plaintiff's assertions that he was denied medical care, medical records were falsified, or medical staff directed correctional employees to use force

10

against him. Moreover, the records demonstrate that plaintiff received appropriate care regarding his alleged paralysis. Plaintiff was evaluated repeatedly. No anatomical basis could be found for his alleged paralysis. Numerous correctional and medical employees observed plaintiff walking without aid, leading to the conclusion that he was manipulating his symptoms. Stated simply, plaintiff's bald allegations of denial of medical care amount to little more than a disagreement with the judgment of his health care providers. Such disagreement with a course of treatment does not provide the framework for a federal civil rights complaint. *See Russell v. Sheffer*, 528 F. 2d 318 (4th Cir. 1975).

## **Conclusion**

For the reasons stated above, the medical defendants' motion for summary judgment shall be granted, plaintiff's claim against defendant Mickel shall be dismissed, defendant Stouffer's dispositive motion shall be denied without prejudice, and plaintiff's notice of voluntary dismissal shall be granted. A separate order follows.


___February 11, 2011_____  _____/s/_____
Date                          J. Frederick Motz
                              United States District Judge